TEXTILE DESIGN CO., INC. *v.* UNITED STATES (No. 4415)[1]

1 C. A. D. 232.

United States Court of Customs and Patent Appeals, March 1, 1943

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellant.
*Paul P. Rao*, Assistant Attorney General (*Joseph B. Brady* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

[Oral argument February 4, 1943, by Mr. Schwartz and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal involves the dutiable classification of certain merchandise imported at the port of New York and invoiced as "Old Woolen Samples." The merchandise was imported from Canada. It was assessed with duty at the rate of 50 per centum ad valorem under paragraph 1120 of the Tariff Act of 1930, as "manufactures, wholly or in chief value of wool, not specially provided for."

Appellant protested the liquidation of the entry, claiming the merchandise to be dutiable either at 18 cents per pound under paragraph 1105 (a) as wool rags or at 10 per centum ad valorem under paragraph 1555 as waste not specially provided for.

Both parties introduced evidence, and the trial court held that the protest should be overruled without affirming the classification of the collector.

Judgment was entered accordingly, from which this appeal was taken.

The merchandise consists of samples of woolen fabrics which had been used in Canada by agents representing foreign mills to show their trade, and from which they procured orders. When the samples ceased to be of value for such purpose, before selling them as rags, the agents waited for appellant's agent and other buyers who would go through them, for the purpose of selecting therefrom such items as might be salable in the United States as designs or patterns for textile manufacturers.

Benjamin Solomon, a vice president of appellant, testified that the business of his company was supplying woolen and worsted manufacturers with designs of textiles; that he visited Canada two or three times a year for the purpose of purchasing used samples; that these samples are not bought or sold in Canada as rags nor by the pound; that while woolen rags, at the time of the instant importation, were selling in the United States at about 18 cents per pound, the imported articles were purchased at prices ranging up to the equivalent of $4 per pound and averaging about $1 per pound.

The witness further testified, in part, as follows:

Q. After you have selected an assortment to be purchased by you what do you do then?—A. I send it to our place in New York, and there we assort them, and I should say 90% we throw out immediately.

Q. Why?—A. I would pick out anything that I think would be of any interest to me, being as I am not paying for them by the pound. I have to pay as much if I pick out 20 as I would if I pick out 50 pounds. Anything that is not a staple style I ship.

Q. What do you do with the 90% or thereabouts that you can't use in your business?—A. We sell them to the rag men.

    \*       \*       \*       \*       \*       \*       \*

Q. What did you do with the remaining 10% or thereabouts?—A. Well, we cut them, and trim them, and fix them up, so that will look presentable. We have show cards which we show to the trade. In most cases we put them on cards, and I should say that out of the 10% we originally keep we throw 90% of that out at the end of the season, because we don't know what is going to sell.

Q. When you say you throw them out what do you mean?—A. We throw them in our rags.

Q. And sell them to the rag men?—Yes, sir.

Q. What do you do with the remaining portion which you do not throw out?—A. Well, a small percentage of it is sold, I should say a fraction of one per cent we sell to our trade.

Q. Who is your trade?—A. Woolen and worsted mills principally.

Q. What is their interest in these samples?—A. They use them to get ideas for color, or construction, or weave, and design.

Q. Do their representatives come to your place of business to examine these?—A. They come to my place, or I would go to their office and show them.

194

Q. What do they do?—A. They would go to these clips and they would pick out whatever would be of interest to them and pay me so much for them.

Q. What have you personally observed them do with these samples? Do they do anything with them after looking at them?—A. After they select them they would cut a piece off and keep this, and the other they would send down to the mill, and eventually they would throw them away.

\* \* \* \* \* \* \*

Q. After the importation of these pieces of cloth do you eventually put some of them on cards?—A. Yes, sir.

Q. And what is the purpose of that?—A. Well, to show them. I would not very well show them in that form. I trim them and cut them around, make them look neat, and paste them up on the cards.

Q. I show you some cards with pieces of cloth attached thereto and ask you if they illustrate the cards which you display to your trade?—A. Yes, sir, they do

The witness identified samples of the involved merchandise, which were received in evidence as Illustrative Exhibit 1.

There was also introduced in evidence as Illustrative Exhibit 2 certain cards with pieces of cloth attached thereto, which the witness testified illustrate the cards which he displays to his trade in selling such used samples.

Upon cross-examination, the witness, Solomon, testified, in part as follows:

X Q. Mr. Solomon, you said the main business of your concern was selling textile designs?—A. Yes, sir.

X Q. You are not interested primarily in the sale of the goods as rags?—A. No, sir.

\* \* \* \* \* \* \*

X Q. When you buy a piece of goods to be used as a sample again, it must have certain characteristics to be salable as a sample; isn't that so?—A. Yes, sir.

X Q. What are those characteristics?—A. That it is not a plain blue or a plain black, and if there is something in there that represents any sort of color, or weave, or pattern, or construction of cloth. In other words, if it is not absolutely a staple stock it has more value as a pattern.

\* \* \* \* \* \* \*

X Q. None of the samples which you bought was purchased for the rag value alone?—A. No; not for the rag value alone.

X Q. The rag value was of secondary interest to you?—A. That is right.

X Q. What price did you pay for these samples?—A. It varies. There is no set price. I never buy them by the pound.

X Q. You never buy them by the pound?—A. Very rarely; in every one out of a hundred cases.

X Q. In this particular case you invoiced them at the pound, did you not?—A. In this case I was supposed to invoice them that way. I didn't place the value on that.

X Q. In other words, in this particular case 14 pounds was worth $60.00?—A. To me they were.

X Q. Isn't that a fairly high price for rags?—A. It is, yes.

X Q. As you stated before you are not interested in the rag value?—A. No.

\* \* \* \* \* \* \*

X Q. What price was received by you for the samples when you sold them as samples?—A. 75 cents.

X Q.. How much for the women's samples?—A. $3.00.

X Q. $3.00 for the women's and 75 cents for the men's samples?—A. Yes, sir.

    \*       \*       \*       \*       \*      \*      \*

Judge OLIVER. All of these you purchase you purchase as potential, possible designs that have the same value?

The WITNESS. Yes, sir.

Judge OLIVER. And then you display them to your trade, and those are the ones from which they select?

The WITNESS. Yes, sir.

Judge OLIVER. When you buy them as potential selling items?

The WITNESS. Yes, sir; when I look at them as far as the price is concerned, it doesn't matter if I picked out four times as much I would have to pay the same price. Anything that is not staple, plain blue or black, I would select as a potential seller.

Judge OLIVER. You buy them for the purpose of selling to designers?

The WITNESS. Yes, sir.

During his direct examination the witness, Solomon, further testified as follows:

Q. Mr. Solomon, I show you the transcript of testimony, that is, the stenographer's minutes in the case of protest 33808–G, etc., which I might add for the benefit of the court, was decided as Abstract 50444, and ask you if you are the Benjamin Solomon who testified in that case.—A. Yes, sir.

Q. Will you please state how the merchandise in the case at bar compares with the merchandise which was before the court in protest 33808–G?—A. The same general type.

In rebuttal, the witness upon cross-examination testified as follows:

Judge BROWN. You don't select anything that you know offhand has no value?

The WITNESS. No. For style and color, or weave I throw aside. Anything that has any color, or style, I just throw aside. When I come up they will show me a batch ready for sale, and from this batch I would pick out anything I think would be of interest to me.

X Q. This first you paid $4.00 a pound for?—A. Yes, sir.

X Q. And you sold them at 14 cents a pound?—A. Yes, sir.

X Q. Aren't you careful to see if there were not five pounds of rags in there?—A. That particular lot is one of the choicest lots that one can get.

X Q. Therefore that high price. On the average, if you averaged the rest of these you will find you paid $1.00 a pound?—A. Yes, sir.

X Q. You could only sell those for 15 cents a pound?—A. Yes, sir.

X Q. Weren't you careful to see if there were five pounds of rags in there?—A. It didn't matter, the percentage for me to sell by weight, the return would be so remunerative that it would not matter if there was a percentage of rags in there. You can probably get a few in there, of these things, that would weigh a pound.

X Q. So you were interested primarily in getting samples?—A. That is right. It didn't matter what the weight was.

William H. Hole, another witness in behalf of appellant, testified that he was a selling agent for a worsted mill.

He further testified as follows:

Q. Do you do business with the Textile Design Company, Inc.?—A. Yes, sir.

Q. Will you please state what business you do with that company?—A. Why, we buy samples from them, for ideas, colors, and weaves, and go through maybe a hundred thousand samples, maybe seventy-five thousand, and in three hours may select twenty of them. On the other hand we may go through a few hundred of them and select fifty of them. It is all just the way they appeal to us.

Q. When you buy them are they usually on cards?—A. Sometimes on cards, loose; as a usual thing on cards.

Q. Are those cards somewhat like plaintiff's collective illustrative exhibit 2?—A. Yes; about that article; similar.

Q. When you get those samples into your place of business what do you do with them?—A. Why, we buy from four or five different other concerns in the same business; and then we lay them out on the table, and possibly of a thousand samples we buy we may use a hundred of them. Those we analyze and send part to the mill and keep a part on file.

Q. What do you do with the remainder?—A. Why, we put them on paper for possibly six months or a year, and eventually they go into the rag box.

Q. What happens to the rag box eventually?—A. They are sold as rags; I don't know, depending on the market, at 10 or 11 cents a pound; I can't tell you exactly.

Q. Do you know what the regular dealers do with them?—A. They can use them as reworked wool, and reprocessed wool.

Q. By that you mean shoddy wool?—A. So called shoddy wool.

Q. Will you please state for what purpose you buy these pieces from the Textile Design Company?—A. With the idea of designing patterns.

Laurence B. Stein, a witness on behalf of appellant, testified that he was a selling agent representing three woolen mills.
He further testified as follows:

Q. Do you do business with the Textile Design Company, Inc.?—A. I do.

Q. Will you please explain the nature of your business with that company?—A. Well, I go there and look over his collection of foreign samples. Incidentally, some of them are domestic—domestic and foreign samples; and make a selection of the colors or designs that seem to be useful for my business.

Q. When you look them over are they on cards?—A. Usually.

Q. Are those cards somewhat like plaintiff's collective illustrative exhibit 2?—A. They are similar cards, yes.

Q. Will you please explain just what you do after you examine the cards?—A. Well, I usually go through a collection. They might consist of an innumerable number of samples—and select a certain proportion, probably up to 10 or 20 samples that I decide that I can use as a seller, or design; and I buy those particular samples.

Q. Are those delivered to your office?—A. I take them right with me.

Q. What do you do with them in your office?—A. Well, they are gone over; they are with other foreign and domestic samples, and certain colors are picked out as the samples that contain those colors or designs, are cut in half. One half goes to the mill, with instructions, and the other half stays in my office for record.

Q. Referring to the samples which you buy from Textile Design Company, Inc., is there any proportion of them which you do not use?—A. You mean of the ones that I have bought?

Q. Yes.—A. Quite often.

Q. What disposition do you make of those?

*　　　*　　　*　　　*　　　*　　　*　　　*

A. I throw them away, I might add, after maybe at the end of the season; not immediately.

Q. Do they have any practical use, so far as you know; those that you throw away?—A. For rags; only as rags.

\* \* \* \* \* \* \*

Q. How often do you go to Mr. Solomon's place of business—that is, the Textile Design Company, Inc.?—A. Up to three or four times a season.

Q. When you go there do you have occasion to observe in his place of business a quantity of pieces of cloth that are similar to this plaintiff's collective illustrative exhibit 1, and also Defendant's collective illustrative exhibit 3?—A. Yes.

Q. As a wool man will you state whether in your opinion they have any practical use?—A. Do you mean after they are discarded by me?

Q. I mean the materials which you have seen in his place of business.

Judge Brown. At the time he buys them or takes them away?

Mr. Schwartz. Before he buys them.

A. They are only used as a design, or as rags.

\* \* \* \* \* \* \*

Judge Oliver. Is there any standard price paid in the trade for the samples you selected out of the group?

The Witness. Yes.

Judge Oliver. Is there a standard price for the piece?

The Witness. Yes, sir.

Judge Oliver. Would you mind telling us what that is?

The Witness. It is 75 cents for individual samples, or $3.00 or $5.00 a card, depending on the sample. Some sell at $3.00 a card and a few at $5.00 a card.

Upon cross-examination the witness testified as follows:

X Q. When you buy these from Mr. Solomon, do you buy the card or do you remove them from the card?—A. Sometimes they are sold by the card and sometimes by the original sample.

X Q. If you were interested in one particular sample on the card, would you remove it from the card or would you buy the card?—A. I would have to buy the card if I wanted it.

X Q. Previously, on the direct examination, you testified that you threw some of the samples away without ever using them?—A. Yes, sir.

X Q. Of course, you pay for the ones you throw away, too, don't you?—A. I certainly get stuck for plenty of them.

X Q. Are all of the exhibits, 1, 2, and 3, useful as samples? Will you please tell me, in your opinion, whether they are useful samples; not desirable for your particular purpose; I mean useful in the trade, to any designer? Useful—not desirable?—A. I would say they might be considered useful.

Sidney G. Wallace, a witness for appellee, testified that he is a member of the firm of Roscoe & Wallace, who are engaged in the textile design business in New York and are in the same type of business as is appellant; that he bought samples of wool cloth in the same manner as did the witness, Solomon; that he is not interested primarily in the rag value of the samples; that he buys samples by the lot, not by the pound or piece; that about 1 per centum by weight of the pieces of cloth that he buys are used as samples and eventually sold as rags; that he mounts upon cards a small piece of each sample that he buys outside of the plain colors in the hope that they will be sala-

198

ble, and all of the samples selected by him in Canada are bought with the intention to mount them as designs.

The trial court in its decision stated:

Based on the record before us, and for the reasons hereinabove set forth it is our opinion that the importation in question consists of two classes of merchandise, to wit, wool samples and wool rags. The wool samples are properly dutiable at 50 per cent ad valorem under paragraph 1120 of the tariff act of 1930 as manufactures composed wholly or in chief value of wool, not specially provided for, as classified by the collector. The wool rags are properly dutiable as such at the rate of 18 cents per pound under paragraph 1105 (a) of the tariff act of 1930, as claimed by the plaintiff.

Since, however, there is nothing in the record to show what proportion of this shipment was wool samples and what proportion was wool rags, we are constrained to overrule the protest without affirming the action of the collector.

Judgment will be rendered accordingly.

Appellant contended before the trial court and contends here that by legislative adoption of judicial decision this case is controlled by a decision of the United States Customs Court in the case of *Hoole Service Co. et al.* v. *United States*, 48 Treas. Dec. 753, Abstract No. 50444. This case was decided in 1925 and it was there held that certain articles invoiced as woolen rags and wool fabrics in the form of swatches, each form of merchandise being valued at not more than 60 cents per pound were not classifiable under paragraph 1109 of the Tariff Act of 1922 as woven fabrics of wool, but were classifiable under paragraph 1105 of the same act as rags.

Appellant also before us cites the case of *S. Solomon* v. *United States*, 54 Treas. Dec. 575, Abstract No. 6686, decided by the United States Customs Court in 1928, wherein it was held that samples of wool fabrics were dutiable as rags under said paragraph 1105 of the Tariff Act of 1922 and not under paragraph 1109 as classified by the collector.

The abstract merely states:

WOOL RAGS—SAMPLES.—Samples of wool fabrics classified at 24 cents per pound and 40 per cent ad valorem under paragraph 1109, tariff act of 1922, are claimed dutiable at 7½ cents per pound under paragraph 1105.

Opinion by BROWN, J. From the evidence it was found that these goods are rags. They were therefore held dutiable at 7½ cents per pound under paragraph 1105. Abstract 50444 followed.

It does not appear from the record that said last-cited case was brought to the attention of the trial court. Appellant's brief purports to set out the decision in full, but inasmuch as it is not in the record nor published nor referred to by the trial court it is our opinion that we may not here consider it. See 31 C. J. S. 627.

Appellant correctly states that the decision in the case of *Hoole Service Co. et al.* v. *United States, supra,* was brought to the attention of Congress during the preparation of the Tariff Act of 1930,

by the Summary of Tariff Information, 1929, page 1693, supplied to Congress by the Tariff Commission, wherein it is stated:

*Scrap woolen rags* were held dutiable as woolen rags under paragraph 1105.

Upon this point of legislative adoption of judicial decision the trial court in its decision stated:

It is our opinion that the plaintiff has not established that the merchandise involved herein is the same as that before the court in The Hoole Service Company, Inc., case, *supra.* The statement by the vice president of the plaintiff corporation, that the merchandise involved herein is of the "same general type" as that which was before the court in the cited case, is vague and indefinite and cannot be extended or amplified to support a holding that the merchandise in both cases is similar "in all material respects." We do not feel that we are bound by the decision in said case.

We are in full agreement with the quoted views of the trial court. For a witness to say that merchandise is of the same general type as other merchandise is a very broad expression. Woolen samples which are entirely worthless for any purpose except rags might be said to be of the "same general type" as the merchandise here involved, and of course a decision with respect to such worthless samples would have no bearing upon the dutiability of the instant merchandise.

In the case of *United States* v. *Henry Maier,* 21 C. C. P. A. (Customs) 41, T. D. 46378, we had occasion to construe the phrase "merchandise of the same general character" as used in paragraph 402 (e) (4) of the Tariff Act of 1922.

We there stated:

We think the words "merchandise of the same general character," as used in said paragraph 4, are not synonymous with the words "such or similar merchandise" as used in paragraph 2 of said section 402 (e).

We further stated that "different manufactures of velvet in the gray may be of the same general character, but not similar to each other."

So in the case at bar the merchandise involved in the case of *Hoole Service Co. et al.* v. *United States, supra,* may have been of the same general type as the merchandise here involved but not necessarily similar thereto.

This conclusion is fortified to some extent by the fact that the merchandise involved in the cited case was valued at less than 60 cents per pound while the instant merchandise was purchased at an average cost of $1 per pound and for some of it appellant paid $4 per pound.

As there is nothing in the decision relied upon, or in the record, establishing that the merchandise there involved was similar to the merchandise here involved, we are in agreement with the trial court that the last above-cited case is not controlling here, and that upon the record before us we must hold that there has been no legislative adoption of judicial decision affecting such merchandise as is here involved.

We are also in agreement with the trial court that the involved merchandise did not entirely consist of rags but that a portion of it, at least, consisted of samples which had a use as such, entirely foreign to the use of rags.

None of the merchandise was bought in the foreign market as rags, and in the United States a portion of it was not sold as rags until after its use as samples had terminated.

As hereinbefore observed, while woolen rags were selling in the United States at an average of 18 cents per pound, appellant paid on the average the equivalent of $1 per pound and for some of it $4 per pound.

Appellant bought the merchandise solely for the purpose of securing designs to sell in the home market at a profit, for which according to the testimony of the witness, Solomon, it received $3 for each women's, and 75 cents for each men's sample sold to textile mills in the United States.

One of appellant's witnesses testified, as hereinbefore quoted, that there is a standard price paid in the United States for such samples, 75 cents for individual samples or $3 a card, while a few sell at $5 per card.

It is true that appellant's witness, Solomon, testified that about 90 per centum of the samples were discarded immediately upon the first sorting, but this he explained by the fact that he bought the samples in Canada by the lot and not by the pound, and therefore he was not concerned whether a large part of the samples purchased by him were worthless for any purpose except rags.

Had appellant exercised greater care in selecting the samples in Canada and imported only such as it believed would be useful as designs, and could be sold as such, it is difficult to conceive upon what theory it could claim that they were woolen rags.

In the case of *Vandegrift & Co.* v. *United States*, 12 Ct. Cust. Appls. 230, T. D. 40231, there were involved books of samples of woolen cloth intended to be used as samples for the sale of merchandise which the samples represented, and then thrown away. They were classified by the collector under the provisions of paragraph 288 of the Tariff Act of 1913, as manufactures of wool. One of the claims made was that they were dutiable as woolen rags.

The opinion in said case stated:

We think that the merchandise was properly classified and assessed by the collector under paragraph 288, supra, at 35 per cent ad valorem.

The samples were manufactured for a definite purpose, and were fully dedicated' to the use, at the time of importation, of aiding in the sale of merchandise of which they were representative.

The record in the case clearly establishes that the merchandise is not "waste," and that it is not used as "rags" and not dutiable as such.

The samples here involved had, according to the testimony, been used in Canada before being sold to appellant, but instead of being thrown away after such use, as in the case last cited, some of them were found useful for another purpose, viz, as designs to be utilized by manufacturers of woolen textiles in the United States, and they were valuable for such purpose. They had not attained the character of rags and became such only after importation and use in the United States.

The trial court found that of the 19 pieces of wool cloth constituting Illustrative Exhibit 1, 13 are clearly identifiable as samples cut from bolts of cloth, "such as are ordinarily used by salesmen or agents to show the pattern of cloth that is being offered for sale"; that the merchandise represented by these samples was properly classified by the collector as manufactures of wool; that the remaining 6 pieces of Illustrative Exhibit 1 were of irregular shapes and frayed and torn, and unfit for further use, and "are of the class of merchandise which the witnesses testified go into the rag pile."

The trial court thereupon held that the importation in question consists of two classes of merchandise, viz, wool samples and wool rags; that the wool samples were properly classified by the collector and that the wool rags are properly dutiable under paragraph 1105 (a), as claimed by appellant, but inasmuch as there is nothing to show in the record what proportion of the shipment was wool samples and what proportion was wool rags, the protest should be overruled without affirming the action of the collector.

Whether the trial court correctly classified the merchandise represented by six of the samples contained in Exhibit 1 we need not here determine. We have examined said Exhibit 1 and it would appear that some of them clearly respond to the common meaning of the word "rag" and could have no use as designs. As to such merchandise, it would seem that the pieces were readily segregable by the "Customs Officers." Had appellant proved what proportion of the shipment consisted of pieces of cloth that could not because of their character be used as designs, relief might be given it, but in the absence of such proof, the court properly overruled the protest without affirming the action of the collector.

As to the samples which perhaps should be classified as rags, but were not readily segregable from the samples which were not rags, they were properly classified by the collector as manufactures of wool, as appellant did not comply with the provisions of paragraph 508 of said tariff act. See *United States* v. *E. E. Holler*, 28 C. C. P. A. (Customs) 124, C. A. D. 133.

For the reasons stated, the judgment appealed from is *affirmed*.